UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

MARIBETH L. WARNER,               )
(Social Security No. XXX-XX-2714), )
                                  )
            Plaintiff,            )
                                  )
      v.                          )      4:10-cv-61-WGH-RLY
                                  )
MICHAEL J. ASTRUE,                )
COMMISSIONER OF THE SOCIAL        )
SECURITY ADMINISTRATION,          )
                                  )
            Defendant.            )

**MEMORANDUM DECISION AND ORDER**

This matter is before the Honorable William G. Hussmann, Jr., United

States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 7,

9) and an Order of Reference entered by Chief Judge Richard L. Young on

August 18, 2010 (Docket No. 12).


**I. Statement of the Case**

Plaintiff, Maribeth L. Warner, seeks judicial review of the final decision of

the agency, which found her not disabled and, therefore, not entitled to

Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act").

42 U.S.C. §§ 416(i), 423(d); 20 C.F.R. § 404.1520(f).  The court has jurisdiction

over this action pursuant to 42 U.S.C. § 405(g).

Plaintiff filed an application for DIB on December 26, 2001.  (R. 113-15).

The agency denied Plaintiff's application initially on May 8, 2002, and on

reconsideration on August 26, 2002.  (R. 102-03, 107-09).  Plaintiff filed a

second application for DIB on January 6, 2004.  (R. 110-12).  The agency denied

Plaintiff's second application on May 25, 2004.  (R. 96-99).  The agency appears

to have denied a third application (which the court is unable to locate in the

record) on February 18, 2005.  (R. 91-94).  There is no evidence in the record to

indicate that Plaintiff ever contested any of these three prior decisions.[1]

----

[1]Consequently, ALJ Robinson should have determined that these three decisions were res judicata, and Plaintiff should not have been entitled to re-argue whether she was disabled from her alleged onset date of December 31, 1999, until February 18, 2005, the date of the most recent decision.  20 C.F.R. § 404.957.  Additionally, Plaintiff was only insured for DIB benefits through December 31, 2005.  Therefore, she would have been left only able to argue that evidence existed between February 18, 2005, and December 31, 2005, that demonstrated her disability.  The decision by ALJ Robinson is devoid of any discussion of these prior three determinations, nor does ALJ Robinson ever discuss the concept of res judicata.

When an ALJ declines to apply res judicata, courts have found that the failure to apply res judicata amounts to a constructive reopening of a prior determination.  *See Byam v. Barnhart*, 336 F.3d 172, 180 (2d Cir. 2003)(if ALJ has considered second application on the merits, then the first application is deemed constructively reopened and res judicata is waived).  In the past, this Magistrate Judge has followed *Byam* because, while an unpublished opinion, the Seventh Circuit has cited *Byam* in *Buchholtz v. Barnhart*, 98 Fed.Appx. 540, 543-44 (7th Cir. 2004).  However, in this instance, we note that those cases relied on the fact that an ALJ has the regulatory authority to reopen a prior determination of the Social Security Administration pursuant to 20 C.F.R. § 404.988 (the regulation concerning DIB) or its counterpart 20 C.F.R § 416.1488 (concerning Supplemental Security Income).

20 C.F.R.  § 404.988 provides that an ALJ may reopen a prior determination within one year for any reason, within four years upon a showing of "good cause," and at any time upon a showing of fraud.  Absent a showing of fraud (which is clearly not present in the record here), an ALJ ceases to have the authority under section 404.988 to reopen a prior determination (even upon a showing of good cause) after four years have expired.  In this case, after August 26, 2006, for the first determination, after May 25, 2008, for the second determination, and after February 18, 2009, for the third determination, the ALJ no longer had the authority to reopen these respective determinations.  This court does not believe that an ALJ can "constructively" reopen a prior determination without the regulatory authority to do so.  Therefore, when the ALJ issued his decision on September 22, 2008, he could not have and did not reopen either of the first two prior decisions (either constructively or otherwise).  We do conclude that the ALJ's decision on the merits did amount to a constructive reopening of Plaintiff's third determination from February 18, 2005, as the four-year limitations period for reopening that determination had not yet expired.  We are limited to examining whether there was medical evidence to support a finding of disability during the relevant time period, which is between May 25, 2004, and

(continued...)

Plaintiff applied a fourth time for DIB[2] on June 21, 2005, alleging disability since November 2, 1999. (R. 19). The agency denied Plaintiff's application both initially and on reconsideration. (R. 81-83, 86-89). Plaintiff appeared and testified at a hearing before Administrative Law Judge Steven Robinson ("ALJ") on April 17, 2008. (R. 1376-410). Plaintiff was represented by an attorney; also testifying was a vocational expert and two medical experts. (R. 1376). ALJ Robinson conducted a second hearing on August 19, 2008.[3] (R. 1411-48). Appearing at the second hearing was a vocational expert and a medical expert. (R. 1411). On September 22, 2008, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy. (R. 18-56). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 3-5). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on June 15, 2010, seeking judicial review of the ALJ's decision.

---

[1](...continued)
December 31, 2005. The fact that the ALJ could not have reopened either of Plaintiff's first two disability determinations complicates this case in that the ALJ considered evidence as well as a period of adjudication from 1999 until 2004 that he did not have the authority to consider. This decision worked to Plaintiff's benefit because it expanded the amount of evidence available for the ALJ to consider in making his disability determination. As we discuss below, even with all of this additional information that should not have been considered, the ALJ's decision is supported by substantial evidence.

[2]Plaintiff's insured status expired on December 31, 2005. (R. 19). Therefore, she must demonstrate disability prior to that date.

[3]ALJ Robinson determined that additional psychological testing of Plaintiff was necessary to clarify a disagreement between the two medical experts at Plaintiff's first hearing.

## II.  Statement of the Facts

### A.  Vocational Profile

Born on May 28, 1963, Plaintiff was 45 years old at the time of the ALJ's decision, with a high school education.  (R. 1380).  Her past relevant work experience included work as a nursing assistant.  (R. 1381).

### B.  Medical Evidence

#### 1.  Plaintiff's Impairments

##### a.  Physical Impairments

On November 9, 1999, orthopedic surgeon John Chambers, M.D., performed a two-level spinal fusion.  (R. 880-81).  On December 6, 2009, he reported that Plaintiff had excellent pain improvement.  (R. 868).  A January 2000 CT scan showed no foraminal stenosis.  (R. 544).  On February 1, 2000, Plaintiff reported improved back pain, but intermittent left leg pain; Dr. Chambers prescribed Neurontin.  (R. 535-36).  Three months later, on May 15, 2000, Dr. Chambers reported that Plaintiff had relatively good results for a two-level fusion, and she was happy with the results.  (R. 862-63).

On September 18, 2000, Plaintiff complained of worsening radiating lower back pain.  (R. 857).  Upon examination, she was neurologically intact; Dr. Chambers added Darvocet to Plaintiff's Relafen.  (R. 857).

On November 29, 2000, John Krawchison, D.C., Plaintiff's chiropractor, opined that she was totally disabled and severely limited in her activities of daily living.  (R. 839-41).  He opined, among other things, that Plaintiff could sit for a total of two hours and stand or walk for a total of one hour a day; occasionally

carry 25 pounds, but not consistently; never climb; and occasionally bend, crawl, squat, and reach. (R. 840-41).

On May 14, 2001, Dr. Chambers referred Plaintiff to a pain clinic because she alleged that she was still experiencing considerable pain in her lower back and hip. (R. 853).

On June 25, 2001, Plaintiff saw John Melendez, M.D., with complaints that her back surgery had not resolved her pain and that she continued to have pain that radiated all the way down to her toes. Dr. Melendez observed that she had a slow but otherwise normal gait, a positive Patrick's test; a positive straight leg raising test; slightly decreased, but symmetrical reflexes; and a normal range of motion in her lower back. (R. 517-18). He diagnosed her with failed back syndrome and prescribed Zanaflex and Methadone. (R. 517). In July and August 2001, Plaintiff reported almost immediate relief from three rounds of steroid injections. (R. 475-516).

On September 10, 2001, Plaintiff reported that her back pain had lessened, but she complained of hip pain. (R. 466-67). Dr. Melendez diagnosed her with bursitis; one month later, on October 10, 2001, she indicated that her hips felt better overall. (R. 462). For Plaintiff's back pain, Dr. Melendez added Vioxx and a Duragesic patch; increased the dosage of Zanaflex; and replaced Methadone with morphine for breakthrough pain. (R. 468). In October 2001, Plaintiff rated her lower back as a three, but an eight with damp weather; Dr. Melendez suggested that she use a Duragesic patch more often on damp days. (R. 457-61).

On December 17, 2001, Raphael Carter, M.D., Plaintiff's primary care physician, completed a form in which he opined that Plaintiff could not perform even sedentary work. (R. 1081-82). He further opined that Plaintiff could occasionally carry up to ten pounds and push/pull eight pounds; never crawl, perform fine manipulation, power grip, or operate foot controls; occasionally bend and kneel; and frequently climb stairs and reach. (R. 1081). He indicated that his opinion was based on his "patient's report." (R. 1081).

On March 30, 2002, consulting physician Wael Harb, M.D., examined Plaintiff. (834-36). Plaintiff was in no apparent distress. (R. 834). Dr. Harb observed that she walked without an assistive device and had a normal gait, range of motion, muscle strength, sensation, and reflexes. (R. 835). His impression was that she had depression and a history of back fusion and chronic back pain. (R. 835).

Plaintiff saw Dr. Melendez for medication management on April 12 and May 28, 2002, and complained of continued lower back pain, especially on damp days. (R. 445, 452).

On December 16, 2002, Dr. Melendez diagnosed Plaintiff with low back pain syndrome. (R. 438-42). An X-ray and CT scan showed no bulging or herniated disc. (R. 434). Dr. Melendez then gave Plaintiff a lumbar facet joint block on February 6, 2003. (R. 425). On March 19, 2003, Plaintiff reported two weeks of good to excellent pain relief, but rated her current pain level as a nine, reduced slightly with medication. (R. 418). On June 26, 2003, Dr. Melendez treated Plaintiff with radiofrequency ablation. (R. 373-74).

On July 23, 2003, Plaintiff reported doing well, but complained of hip pain after she "overdid it" hanging a lot of wallpaper; Dr. Melendez attributed her pain to shingles, which Plaintiff explained she had suffered from in the past. (R. 368).

On August 28, 2003, Plaintiff complained of severe bilateral lower extremity pain that was a ten. (R. 358-64). Nurse Tanner (who worked with Dr. Melendez) observed that her legs had redness, mild swelling, allodynia, and hyperalgesia. (R. 358). Nurse Tanner diagnosed Plaintiff with complex regional pain syndrome. (R. 359).

On March 20, 2004, consulting physician Elpidio Feliciano, M.D., examined Plaintiff, who complained primarily of lower back pain that had progressively gotten worse over the past 13 years, was aggravated by movement, and was alleviated by medications and rest. (R. 734-36). Plaintiff reported that she could walk four blocks. (R. 734). Dr. Feliciano noted Plaintiff's review of systems was positive for diffuse arthralgias and myalgias, but he did not identify any tender points. (R. 734). He observed that Plaintiff squatted without difficulty and had a normal gait, reflexes, muscle and grip strength, and finger manipulation, and was able to walk on heels and toes. (R. 734-35). Dr. Feliciano noted that Plaintiff had stiffness in her lower back and knees and a spinal spasm, but a full range of motion in all joints and a negative straight leg raising test. (R. 735). His impression was that she had a past medical history complicated by a car accident, fibromyalgia, reflex sympathetic dystrophy ("RSD"), osteoarthritis, and Berger's disease; indicated that arthralgias were her

main debilitating complaint; and did not opine as to any functional limitations. (R. 735).

On April 19, 2004, Plaintiff was seen for follow-up of her lower extremity pain secondary to complex regional pain syndrome. She was scheduled for a temporary spinal cord stimulator at Dr. Melendez's suggestion. (R. 330-33).

On June 23, 2004, Plaintiff had a temporary spinal cord stimulator lead placed in her lower back to help relieve pain that was radiating into her lower extremity. (R. 328-29). Two days later, she rated her pain level as a four. (R. 326). On July 1, 2004, Plaintiff continued to report good relief and was scheduled for a permanent stimulator. (R. 324-25).

On September 14, 2004, Mayra Bonet, M.D., implanted a spinal cord stimulator in Plaintiff's lower back (R. 320-23); one week later, she rated her pain as a five, which was a significant relief for Plaintiff for which she was very happy (R. 318).

On October 19, 2004, Plaintiff complained of hip pain, which she rated as a three on average after use of her spinal cord stimulator (R. 316); X-rays taken on November 17, 2004, showed normal hips and minimal degenerative disc disease in the lumbar spine. (R. 317).

On January 15, 2005, consulting physician Bradford Bichey, M.D., examined Plaintiff. (R. 698-701). Plaintiff reported that she was diagnosed with RSD in January 2004 and had some improvement with medication, and she occasionally used a walker or wheelchair. (R. 698). However, Dr. Bichey noted she did not bring any assistive device and appeared to ambulate relatively

normally.  (R. 698).  He observed that Plaintiff had a relatively normal gait; could walk on heels and toes, as well as squat; had a negative straight leg raising test; and normal reflexes and muscle strength.  (R. 699-700).  He noted that Plaintiff's range of motion examination was suspect because she declined performing forward flexion of her lumbar spine.  (R. 700).  She otherwise had a full range of motion in her joints, including extension and lateral flexion of her lumbar spine.  (R. 700-01).  His impression was that she had a history of RSD and lumbar spine pain and some exam discrepancies that did not correlate with her complaints.  (R. 700).  Given her poor compliance with the exam, he could not conclude that activities of daily living were clearly affected, and he opined that she could:  sit, stand, and walk for extended periods, and for at least two hours a workday; walk without an assistive device; and frequently lift up to 20 pounds.  (R. 700).

On January 17, 2005, Plaintiff complained of right hip pain.  (R. 314).  Plaintiff had rated the pain as a two or three on average two weeks earlier with use of her stimulator.  (R. 315).  Dr. Melendez observed that Plaintiff could not perform a range of motion test with her hip and had weakness in her thigh muscles.  (R. 314).  Plaintiff reported that she was happy with her medications, and Dr. Melendez referred her to physical therapy.  (R. 314).

On April 6, 2005, Dr. Melendez indicated that the pain from Plaintiff's RSD was reduced to a five on a scale of one to ten and that her symptoms were controlled, but opined that Plaintiff would not have the RFC to work a full eight-hour workday.  He ordered a test to determine Plaintiff's RFC.  (R. 313).

On August 29, 2005, Robert MacWilliams, M.D., performed a consultative exam of Plaintiff. (R. 624-29). Plaintiff explained that she had chronic fatigue, aches everywhere, and joint pain. (R. 624). Dr. MacWilliams suggested that there was no evidence of Plaintiff's Berger's disease at the present time. (R. 624). Plaintiff had a 30-year history of smoking a half pack of cigarettes a day. (R. 625). Plaintiff indicated that she could walk for five to ten minutes before she had leg pain and knee swelling, but that she could still perform her activities of daily living. (R. 625). Dr. MacWilliams observed that she could not heel-toe walk or stand on either leg alone, but could tandem walk and perform a half-squat. (R. 628). He noted that Plaintiff could fully close her fingers into a fist, pick up coins, and button clothing. (R. 627). She had decreased range of motion in her lumbar spine, but a normal range of motion in all other joints; a tremor in both legs, which may have been due to her spinal stimulator; localized, but no radiating pain with a straight leg raising test to 90 degrees; no tenderness in any joints or muscles; and a normal gait, sensation, reflexes, and motor strength with no evidence of nerve root impingement. (R. 627-28). Dr. MacWilliams' impressions were post lower back surgery with a spinal stimulator; psoriasis; and a history of: fibromyalgia, depression, anxiety, leg and foot pain with swelling, and Berger's disease, with no evidence of the latter two conditions. (R. 628). He opined that she could perform light to medium work in a primarily seated position; walk ten to 15 minutes per hour; never crawl, work around unprotected heights, or climb ladders, ropes or scaffolding; and occasionally climb ramps and stairs. (R. 628).

On August 30, 2005, Plaintiff reported an improvement in pain with the spinal stimulator.  (R. 305-07).  She could tolerate 15 minutes on a treadmill.  (R. 305).  However, Plaintiff had frequently cancelled rehab visits which had interfered with her progress.  (R. 305).

On October 17, 2005, Plaintiff saw Nurse Tanner for reprogramming of her spinal cord stimulator and reported that her stimulator and her medications were working well.  (R. 299-300).  Plaintiff reported pain of seven on a scale of one to ten.  (R. 299).

### b.  Mental Impairments

On April 24, 2002, consulting psychologist Richard Karkut, Psy.D., examined Plaintiff.  (R. 828-33).  Plaintiff reported that she was claiming disability based on several physical impairments and "stress."  (R. 828).  Plaintiff reported that she attempted suicide in 1987 and 2000, and despite being on Elavil, she had no interest in most activities or leaving her home.  (R. 831).  However, Plaintiff also explained that she had recently gone to Louisville to see fireworks.  (R. 829).  Additionally, Dr. Karkut noted, that despite Plaintiff's claims, she displayed fair concentration and memory.  (R. 831).  She indicated that she could cook simple meals; load the dishwasher; shop for groceries with help; dust with breaks; do light laundry; drive occasionally; sweep occasionally; mop the floor while seated; and go walking and fishing with the kids.  (R. 831-32).  She reported difficulty getting dressed, and that she no longer, among other things, baked, hiked, or attended movies or church.  (R. 832-33).  Dr. Karkut observed that Plaintiff was not suicidal but cried a lot, and had allegedly lost

quite a bit of weight because of depression; observed that she had fair concentration and memory; diagnosed her with major depressive disorder, single episode, severe; and assigned her a current GAF score of 49 and a highest GAF score in the past year of 55. (R. 831, 833).

On May 11, 2004, Dr. Karkut performed a second mental status examination. (R. 720-23). Plaintiff complained of fatigue and problems with memory and concentration, poor appetite, worries about her mounting debts, and depression because she cannot return to work, but stated that decreased pain lifted her mood. (R. 722). Plaintiff did light laundry; ran the dishwasher; watched television; played with her grandchildren; shopped occasionally; walked around the block; and fed her parrot and two cats. (R. 722). Dr. Karkut observed that Plaintiff showed adequate memory and judgment; diagnosed her with major depressive disorder, single episode, mild; assigned her a GAF score of 65 and a highest GAF score in the past year of 75. (R. 721-23).

On August 18, 2005, consulting psychologist Richard Winn, Ph.D., examined Plaintiff, who reported no prior mental health treatment, except one session three years earlier when her and her husband were separated. (R. 645-48). She stated that she did little housework; managed the family finances poorly with her husband; shopped monthly when able; watched television; and saw her family once a day. (R. 646). Dr. Winn observed that Plaintiff had an occasionally sad and constricted affect; normal attention and concentration, with possible impairment due to pain; intact memory; logical thought processes; a high average range of intelligence; and normal decision making, with reports that

her medication occasionally confused her. (R. 646-47). He rated Plaintiff's mood between a three or four at the exam and a one or two at home; opined that her "current [coping] skill deficits appear[ed] to be related to her physical limitations"; diagnosed her with a major depressive disorder, severe; assigned her a current GAF score of 40 to 45; and gave her a guarded to fair prognosis with mental health intervention. (R. 647-48).

On April 17, 2008, at Plaintiff's first hearing before ALJ Robinson, Morton Tavel, M.D., appeared as a medical expert. (R. 1395-405). He opined that, based on the examination by Dr. MacWilliams, Plaintiff's impairments did not meet any physical listing, and there was no objective medical evidence as to her complaints of leg and feet swelling or to confirm a diagnosis of RSD or Berger's disease. (R. 1397-98, 1404). He opined that Plaintiff could perform light work with occasional postural activities and did not need an assistive device. (R. 1400-01). Finally, he opined that given the absence of physical findings and the persistence of her complaints, she might meet Listing 12.07 (somatoform disorders). (R. 1398, 1404-05).

Psychologist Jack Thomas, Ph.D., also testified on April 17, 2008, and opined that Dr. Tavel's opinion about a somatoform disorder was unsupported because the mere absence of physical findings is not diagnostic for Listing 12.07. (R. 1408). He testified that a personality test (the MMPI-2) would indicate whether Plaintiff had a somatoform disorder. (R. 1406-08). The ALJ ordered that the test be given and that Plaintiff undergo a consultative psychological evaluation. (R. 1406-08).

On May 20, 2008, consulting psychologist Deborah Zera, Psy.D., evaluated Plaintiff, who indicated that she was depressed because she had pain and could not work. (R. 1057-59). She reported that she sometimes had difficulty comprehending others, but Dr. Zera did not observe this. (R. 1057). Plaintiff reported that she had good family support, but no friends, and she stated that her husband was currently verbally abusive and beat her 15 years earlier. (R. 1057). Plaintiff complained of low energy, crying daily, anxiety, and feeling that people were staring and talking about her; she denied paranoia, suicidal ideation, and hallucinations. Plaintiff reported that she had no psychiatric admissions, but went to counseling 15 years earlier; she did not return due to cost. (R. 1057). She stated that medications kept her depression under fairly good control, and she had to lie down after tending to her personal care, due to pain; did not drive because her medications made her drowsy; visited her grandchildren; went tanning to help her back; sometimes walked the dog around the block; and helped with cooking, housework, shopping, and laundry when able. (R. 1057). Dr. Zera observed that Plaintiff seemed uncomfortable and showed a mild tremor, but showed normal concentration, memory, judgment, and social interaction. (R. 1057-58). Dr. Zera reported that Plaintiff produced an invalid score on the MMPI-2, although she seemed to have no difficulty understanding the questions. (R. 1058). She opined that one of Plaintiff's validity scores was indicative of inconsistent responding and that other validity scores suggested that she could have been resistant to testing, overly self-critical, malingering, or exaggerating her symptoms as a plea for help. (R. 1058).

Dr. Zera opined that Plaintiff had intact concentration, attention, and memory, was appropriate in her social interactions, and had intact judgment and reasoning. (R. 1059). Dr. Zera then diagnosed Plaintiff with major depression, recurrent, moderate, without psychotic symptoms, and generalized anxiety disorder; assigned her a GAF score of 50; and opined that she could manage her funds. (R. 1059).

Dr. Zera also completed a medical assessment form in which she opined that Plaintiff had a fair ability to deal with work stress, but a good ability to interact with supervisors; function independently; maintain attention and concentration; understand, remember, and carry out complex instructions; maintain personal appearance; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability. (R. 1061-62). She opined that Plaintiff had an unlimited ability to follow rules; relate to co-workers and the public; use her judgment; and understand, remember, and carry out detailed or simple instructions. (R. 1061-62).

At Plaintiff's second hearing on August 19, 2008, Dr. Thomas testified again. (R. 1414-436). He explained that the problem with Plaintiff's case was that, routinely, the actual mental status exams were within normal limits, but, based essentially entirely on Plaintiff's subjective complaints, there would be GAF scores that showed severe impairment. (R. 1419-22). He opined that based upon the results of all of Plaintiff's mental health status exams, her major depressive disorder was mild, and it was her only medically determinable mental impairment. (R. 1424-25). Dr. Thomas further opined that even though Dr.

Zera gave an invalid administration of the personality test, Plaintiff's scores suggested that she attended to each question very carefully and had intact concentration. (R. 1420-21). He opined that the severe GAF scores were inconsistent with their mild examination findings and ratings and moderate diagnoses, but that the mild GAF score Dr. Karkut assigned was largely consistent with his mild findings. (R. 1419-24). He opined that, in looking at Listing 12.04, Plaintiff suffered from mild limitations in activities of daily living, mild to moderate difficulties in maintaining social functioning, and mild to moderate difficulties in maintaining concentration, persistence, or pace. (R. 1426-27).

## 2. State Agency Review

On February 1, 2002, state agency reviewing psychologist Donna Unversaw, Ph.D., completed a Psychiatric Review Technique in which she opined that Plaintiff's depression was not severe. (R. 801-14). Dr Unversaw indicated that Plaintiff was mildly limited in her activities of daily living; social functioning; and concentration, persistence, or pace, and had no episodes of decompensation. (R. 811). Dr. Unversaw noted Plaintiff's activities of daily living and explained that Plaintiff's complaints were only partially credible. (R. 813). Fred Kladder, Ph.D., affirmed the opinion on August 20, 2002. (R. 801).

On May 2, 2002, state agency reviewing physician A. Lopez, M.D., completed a Physical Residual Functional Capacity Assessment. (R. 815-22). Dr. Lopez opined that Plaintiff could perform light work except that she could only occasionally perform all postural activities. (R. 816-17). Plaintiff was

otherwise not limited. (R. 815-22). Dr. Lopez based this decision on the medical evidence that revealed that Plaintiff had no sensory loss, normal gait and station, and normal strength. (R. 816). On August 19, 2002, S. Roush, M.D., affirmed the opinion. (R. 822).

On May 19, 2004, state agency reviewing psychologist K. Neville, Ph.D., completed a Psychiatric Review Technique in which he opined that Plaintiff's depression was not severe and mildly limited her activities of daily living; social functioning; and concentration, persistence, or pace. (R. 704-17).

On February 3, 2005, state agency reviewing physician M. Brill, M.D., completed a Physical Residual Functional Capacity Assessment in which he opined that Plaintiff could perform light work and never climb ladders, ropes, or scaffolds, but could occasionally perform all other postural activities. (R. 688-95).

On February 15, 2005, state agency reviewing psychologist B. R. Horton, Psy.D., completed a Psychiatric Review Technique. (R. 671-83). Dr. Horton opined that Plaintiff's mental impairments were not severe; did not limit social functioning; and only mildly limited concentration, persistence, or pace, and activities of daily living. (R. 681). He referenced Dr. Karkut's exam and the activities reported therein. (R. 683).

On August 25, 2005, state agency reviewing psychologist Joelle Larsen, Ph.D., completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment. (R. 285-87, 630-43). She opined that Plaintiff's depression moderately limited her social functioning and

concentration, persistence, or pace, and mildly limited her activities of daily living.  (R. 640).  She further opined that Plaintiff was moderately limited in her ability to:  complete a normal workday without interruptions from psychological symptoms; perform at a consistent pace without unreasonable rest periods; and respond appropriately to changes in the work setting.  (R. 286).  She otherwise found that Plaintiff was not significantly limited in any of the remaining 18 enumerated mental activities.  (R. 285-86).  She concluded that Plaintiff could perform simple, repetitive tasks, and her limitations were primarily due to her physical impairments.  (R. 287).  On December 22, 2005, K. Neville, Ph.D., affirmed the opinion.  (R. 287).

On September 27, 2005, state agency reviewing physician J. Sands, M.D., completed a Physical Residual Functional Capacity Assessment in which he opined that Plaintiff could perform light work with occasional postural movements, but otherwise had no physical limitations.  (R. 289-96).  On December 21, 2005, B. Whitley, M.D., affirmed the opinion.  (R. 296).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); see also *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility.

*Richardson*, 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner. *See Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

## IV. Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his/her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the

burden shift to the Commissioner.  *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through December 31, 2005; Plaintiff also had not engaged in substantial gainful activity since the alleged onset date.  (R. 54).  The ALJ found that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had five impairments that are classified as severe:  (1) status postoperative anterior diskectomy L4-L5, anterior fusion L4-L5 and L5-S1, and anterior prosthetic device L4-L5 and L5-S1; (2) fibromyalgia; (3) history of psoriasis; (4) history of Berger's disease; and (5) mild/moderate depression.  (R. 54).  The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 54).  Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible.  (R. 54).  Consequently, the ALJ concluded that Plaintiff retained the RFC to:  lift/carry 20 pounds occasionally and ten pounds frequently; sit/stand/walk six hours in an eight-hour workday; occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs; never climbing ladders, ropes, or scaffolds, but had no other physical limitations.  (R. 54).  The ALJ opined that Plaintiff did not retain the RFC to perform her past work.  (R. 55).  However, Plaintiff retained the RFC to perform a significant number of jobs in the regional economy, including maid (6,000 jobs), hand packager (4,000 jobs), and assembler (5,000 jobs).  (R. 55). The ALJ concluded by finding that Plaintiff was not under a disability.  (R. 55).

# VI. Issues

Plaintiff has essentially raised four issues. The issues are as follows:

1. Whether Plaintiff's reflex sympathetic dystrophy was a severe impairment.

2. Whether Plaintiff's impairments met Listing 12.07.

3. Whether the ALJ conducted a flawed credibility determination.

4. Whether the ALJ erred in not considering Plaintiff's award of long-term disability benefits.

**Issue 1: Whether Plaintiff's reflex sympathetic dystrophy was a severe impairment.**

Plaintiff first argues that the ALJ erred when he found that her reflex sympathetic dystrophy was not a severe impairment. As discussed above, 20 C.F.R. § 404.1520 provides a five-step evaluation process. Step two of that process involves determining if an individual has a severe impairment. Step two is simply an initial screening device to eliminate consideration of individuals who have only slight impairments. *Taylor v. Schweiker*, 739 F.2d 1240, 1243 n.2 (7th Cir. 1984). As then District Judge David Hamilton indicated, "[a]s long as the ALJ proceeds beyond step two, as in this case, no reversible error could result solely from his failure to label a single impairment as 'severe.' The ALJ's classification of an impairment as 'severe' or 'not severe' is largely irrelevant past step two. What matters is that the ALJ considers the impact of all of the claimant's impairments – 'severe' and 'not severe' – on her ability to work." *Gordon v. Astrue*, 2007 WL 4150328 at *7 (S.D. Ind. 2007).

In Plaintiff's case, the ALJ explicitly noted several different examinations of Plaintiff that found none of the symptoms of reflex sympathetic dystrophy. (R. 20-25). Furthermore, the ALJ in this case did proceed beyond step two of the five-step sequential evaluation process and considered all of Plaintiff's impairments. The ALJ reasonably concluded that Plaintiff's reflex sympathetic dystrophy did not cause any additional limitations beyond those caused by Plaintiff's severe impairments. (R. 48-50). Therefore, the ALJ did not err by finding this impairment to be a non-severe impairment.

**Issue 2: Whether Plaintiff's impairments met Listing 12.07.**

Next, Plaintiff argues that the ALJ should have found that her mental impairments met Listing 12.07 in 20 C.F.R. Part 404, Subpart P, Appendix 1. That particular Listing provides as follows:

> 12.07 *Somatoform Disorders:* Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
> A. Medically documented by evidence of one of the following:
> 1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or
> 2. Persistent nonorganic disturbance of one of the following:
> a. Vision; or
> b. Speech; or
> c. Hearing; or
> d. Use of a limb; or
> e. Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia; or
> f. Sensation (*e.g.,* diminished or heightened).
> 3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;
> AND

B.　Resulting in at least two of the following:
　　　　1.　Marked restriction of activities of daily living; or
　　　　2.　Marked difficulties in maintaining social functioning; or
　　　　3.　Marked difficulties in maintaining concentration,
persistence, or pace; or
　　　　4.　Repeated episodes of decompensation, each of extended
duration.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.07.　In order for an

individual to be disabled under a particular listing, her impairment must meet

each distinct element within the listing.　*Rice v. Barnhart*, 384 F.3d 363, 369

(7th Cir. 2004).　And, it is important to remember that, at step three, the burden

rests on Plaintiff to demonstrate that she meets the listing.

　　　In this case, Plaintiff's only support for a determination that her

impairments met Listing 12.07 was a statement from Dr. Tavel at her first

hearing.　Dr. Tavel opined that Plaintiff did not have any physical impairment

that could be expected to produce the type of disabling symptoms, including the

amount of pain that Plaintiff was alleging.　He then opined that the only thing

that could explain Plaintiff's allegations was a somatoform disorder.　However,

Dr. Tavel is not a psychologist.　When the ALJ called the second medical expert,

Dr. Thomas (who is a psychologist), to testify, he respectfully disagreed with Dr.

Tavel.　Dr. Thomas explained that the mere fact that there was an absence of

physical findings did not indicate the presence of a somatoform disorder.　In fact,

as discussed above, an individual must meet all of the criteria of Listing 12.07 in

order to be found disabled pursuant to that listing.　No mental health provider in

the record diagnosed Plaintiff with a somatoform disorder.　Additionally, the

evidence does not indicate that Plaintiff suffers from the number of "marked"

limitations or repeated episodes of decompensation necessary to satisfy the "B"

criteria of Listing 12.07.  Plaintiff was routinely found to have only mild or

moderate limitations in her activities of daily living, ability to maintain social

functioning, or ability to maintain concentration, persistence, or pace.

Consequently, Plaintiff has failed to carry her burden of demonstrating that her

impairment met all of the criteria of Listing 12.07, and the ALJ did not err.

**Issue 3:  Whether the ALJ conducted a flawed credibility determination.**

Plaintiff also argues that the ALJ conducted an improper credibility

determination, including failing to address Plaintiff's medications.  An ALJ's

credibility determination will not be overturned unless it is "patently wrong."

*Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  However, here the ALJ's

"credibility" decision is not only an analysis of Plaintiff's credibility, but also an

evaluation of Plaintiff's complaints of pain.  Therefore, the ALJ must consider

SSR 96-7p, the regulation promulgated by the Commissioner to assess and

report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in

when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying
> medically determinable physical or mental impairment(s)--i.e., an
> impairment(s) that can be shown by medically acceptable clinical
> and laboratory diagnostic techniques--that could reasonably be
> expected to produce the individual's pain or other symptoms.  The
> finding that an individual's impairment(s) could reasonably be
> expected to produce the individual's pain or other symptoms does
> not involve a determination as to the intensity, persistence,
> or functionally limiting effects of the individual's symptoms.  If there is
> no medically determinable physical or mental impairment(s), or if
> there is a medically determinable physical or mental impairment(s)
> but the impairment(s) could not reasonably be expected to produce

the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.* This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p (emphasis added; footnote omitted). SSR 96-7p further provides that the ALJ's decision regarding the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual symptoms, such as pain, are considered, several factors are relevant, including: (1) the individual's daily activities; (2) the location, duration,

frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

Plaintiff argues, in part, that the ALJ's credibility determination is flawed because the ALJ disregarded the statements provided by Plaintiff's father, daughter, and husband. However, all three of these statements were provided nearly three years after Plaintiff's insured status expired. There is no evidence to suggest that these three statements purported to relate to Plaintiff's condition prior to December 31, 2005. Each of the statements suggested what Plaintiff's limitations were in 2008. Thus, the statements were not relevant to Plaintiff's claim of disability, and the ALJ was free to reject them.

As for Plaintiff's claims of disabling limitations, including pain, the ALJ conducted a very thorough examination of Plaintiff's credibility at R. 43-53. The ALJ specifically stated the standard outlined in SSR 96-7p for assessing an individual's credibility. (R. 43).

The ALJ then went on to reference Dr. Chambers' opinions in the months after Plaintiff's back surgery, including the opinion in May 2000 that Plaintiff

could perform light to sedentary work. (R. 44). The ALJ determined that,

Plaintiff's allegations of back pain, "such that the claimant cannot perform at

least sedentary and/or light work activity as outlined by Dr. Tavel, are not

corroborated or supported by the medical evidence of record . . . ." (R. 48). The

ALJ also referenced essentially normal X-ray/CT scan results. (R. 50).

The ALJ noted Plaintiff's history of treatment for her back pain, including

physical therapy and steroid injections, radio frequency treatment, and a

stimulator implant. (R. 50-51). The ALJ explained that Plaintiff, at times,

reported getting good results, explaining that "a pain estimate of 3 on a scale of 0

to 10 does not sound disabling." (R. 51)(citing Donahue v. Barnhart, 279 F.3d

441, 444 (7th Cir. 2002)).

The ALJ also discussed Plaintiff's mental impairments. With regard to

Plaintiff's allegations concerning her mental health, the ALJ noted that Dr.

Thomas testified that Plaintiff's mental status examinations throughout the

record were essentially normal. (R. 46). The ALJ also noted that Plaintiff's

veracity was highly suspect given her invalid MMPI-2 profile. (R. 48). The ALJ

also pointed out that Plaintiff had not sought mental health treatment during the

time at issue in this case, which made her claims of depression "not entirely

credible." (R. 49).

The ALJ also made note of failures to show up for appointments,

including: (1) with Dr. Chambers in 2000 (R. 49); (2) when she could not wait

for a programmer to change her stimulator (R. 52); and (3) when she had

frequent cancellations for physical therapy sessions which "interfered with

progress made." (R. 52). The ALJ was certainly warranted in mentioning these cancellations, as they can be indicative of an impairment that is not as severe as alleged.

With regard to Plaintiff's allegations of impairment due to reflex sympathetic dystrophy, the ALJ noted that there was no evidence that Plaintiff met the diagnostic criteria for this impairment. (R. 50-51).

Finally, concerning Plaintiff's complaints of pain, the ALJ determined that Plaintiff was exaggerating her symptoms (R. 53), explaining:

> The claimant's complaints of pain at the hearings are inconsistent with those reported to the claimant's treating sources.
>
> The claimant's testimony at the hearing regarding her limitations, restrictions, residual functional capacity, and pain is not consistent with the medical evidence of record, not consistent with the various clinical examinations which have been performed, not consistent [with] the clinical findings reported, and not consistent with the imaging studies in the record.
>
> The claimant's personal appearance and demeanor at the hearings did not convey the impression the claimant was experiencing any significant pain and/or any other significant pathology or symptomatology. The claimant appeared to sit comfortably and testify without any overt indicia of any significant pain or any other problem.
>
> At the hearing the claimant testified to limited activities of daily living. I do not doubt that the claimant does very little on a daily basis. What I do doubt is the causal nexus between the claimant's extremely limited daily activities and the claimant's allegations that this results from [her] impairments.

(R. 52). An ALJ is permitted to make observations about a claimant at the hearing, and there was nothing improper about this.

While this opinion meanders a bit from topic to topic and is not the easiest to follow, we cannot say that it was "patently wrong." The ALJ correctly focused

on the issues listed in SSR 96-7p.  Contrary to Plaintiff's allegations, the ALJ did

not give too much weight to the invalid MMPI-2 score; it was, instead, only one of

many factors the ALJ used to determine that Plaintiff was not credible.  The ALJ

made his own observations of Plaintiff's demeanor, which is permissible.  The

ALJ focused on the lack of objective support for Plaintiff's allegations of extreme

limitations.  The ALJ also reasonably noted some instances in the record of

failure to appear at scheduled appointments.  Based on the totality of all of this

evidence, the ALJ determined that Plaintiff was not credible.  As that decision is

not patently wrong, it must be affirmed.

**Issue 4:  Whether the ALJ erred in not considering Plaintiff's award of
long-term disability benefits.**

Finally, Plaintiff claims that the ALJ erred by not properly addressing a

decision by Plaintiff's long-term disability insurance provider finding Plaintiff

disabled.  As the Seventh Circuit has explained, "[d]eterminations of disability by

other agencies do not bind the Social Security Administration . . . ."  *Allord v.

Barhart*, 455 F.3d 818, 820 (7th Cir. 2006).  Social Security Ruling 06-03p does

provide that, even though the SSA is not bound by the disability determinations

of other governmental or nongovernmental agencies, "the adjudicator should

explain the consideration given to these decisions in the notice of the decision for

hearing cases."  SSR 06-03p.

The record does include a fax sheet indicating that plaintiff's long-term

disability insurance provider had determined that she was "disabled from any

occupation on 03/08/2002" as well as the actual policy.  (1344-71).  However,

there is no evidence in the record that provides the rationale or evidentiary

support that the insurer used to determine disability. Thus, this does not amount to the type of "decision" by a nongovernmental agency that SSR 06-03p requires an ALJ to discuss, and the ALJ did not commit reversible error by failing to address it.

## VII. Conclusion

The ALJ did not err at step two when he found that Plaintiff's reflex sympathetic dystrophy was not severe. Plaintiff's impairment did not meet Listing 12.07 for somatoform disorders. The ALJ's credibility determination was not patently wrong. And, the ALJ was not obligated to address Plaintiff's award of long-term disability benefits because the record did not include an actual decision that the ALJ could evaluate. The final decision of the Commissioner is, therefore, **AFFIRMED.**

**IT IS SO ORDERED.**

**Dated:** September 12, 2011

William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Steven K. Robison
MONTGOMERY ELSNER & PARDIECK
srobison@meplegal.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov